UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

Plaintiff,

v.                                                          Case No. 22-cv-1293-pp

ALLISON HOHENSTERN, CHERYL JEANPIERRE,
ROBERT WEINMAN, ASHLEY HASELEU,
JESSICA HOSFELP, MEGAN LEBERAK,
WHITNEY PITZLIN, BRIAN TAPLIN,
VICK GWENDOLYN, ANN YORK,
JEREMIAH DAWSON, RANDALL HEPP,
EMILY PROPSON, ROBERT RYMARKIEWICZ
and YANA PUISH,

Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 5), DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 8), DENYING AS MOOT PLAINTIFF'S SECOND MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 17), DENYING AS MOOT PLAINTIFF'S MOTION TO WAIVE PAYMENT OF INITIAL PARTIAL FILING FEE (DKT. NO. 23) AND SCREENING AMENDED COMPLAINT UNDER 28 U.S.C. §1915A**

Timothy Durley, an individual incarcerated at Waupun Correctional Institution who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants failed to provide adequate medical treatment and retaliated against him. On November 21, 2022, the court received the plaintiff's amended complaint. Dkt. No. 24. This decision resolves the plaintiff's motions for leave to proceed without prepaying the filing fee, dkt. nos. 2, 17, for a preliminary injunction, dkt. no. 5, to appoint counsel, dkt. no.

1

8, and to waive payment of the initial partial filing fee, dkt. no. 23, and screens his amended complaint, dkt. no. 24.

I.    **Motions for Leave to Proceed without Prepaying the Filing Fee (Dkt. Nos. 2, 17) and to Waive Payment of the Initial Partial Filing Fee (Dkt. No. 23)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On November 17, 2022, the court ordered the plaintiff to pay an initial partial filing fee of $2.45 by December 8, 2022. Dkt. No. 21. The next day, the court received the plaintiff's first, incomplete motion to waive payment of the initial partial filing fee. Dkt. No. 23. The one-paragraph motion, which consisted of only the first page of the Prisoner Request to Proceed in District Court Without Prepaying the Full Filing Fee, does not explain why the plaintiff believed he could not pay the initial partial filing fee and merely requested that the court allow him to proceed without paying it. Id.

On November 30, 2022, the court received from the plaintiff a letter asking the court to allow him to proceed without paying the initial partial filing fee. Dkt. No. 25. Again, the plaintiff did not explain why he could not pay the initial partial filing fee, but he asked the court to "please see enclosed letter of 5

2

pages of why [the plaintiff] should be allow[ed] to proceed on both case#
without paying partial filing fee, for case# 22-cv-1293 [and] case# 22-cv-1127."
Id. The five-page letter to which the plaintiff refers is docketed only in Case No.
22-cv-1127 at Dkt. No. 15. The court detailed the contents of that letter in the
screening order in Case 22-cv-1127 at Dkt. No. 17.

Despite the plaintiff's motion and letters asserting that he was unable to
pay the initial partial filing fee, the court received payment of the fee on
December 8, 2022.[1] The court will grant the plaintiff's first motion for leave to
proceed without prepaying the filing fee, dkt. no. 2, and will require him to pay
the remainder of the filing fee over time in the manner explained at the end of
this order. The court will deny as moot the plaintiff's second motion for leave to
proceed without prepaying the filing fee, dkt. no. 17, and his motion to waive
payment of the initial partial filing fee, dkt. no. 23.

## II. Screening the Amended Complaint (Dkt. No. 24)

### A. Federal Screening Standard

Under the PLRA, the court must screen complaints brought by
incarcerated persons seeking relief from a governmental entity or officer or
employee of a governmental entity. 28 U.S.C. §1915A(a). The court must
dismiss a complaint if the incarcerated person raises claims that are legally
"frivolous or malicious," that fail to state a claim upon which relief may be

---

[1] The same day, the court also received payment of the $1.87 initial partial
filing fee in Case No. 22-cv-1127-pp.

granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the amended complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, the amended complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The amended complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of that right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less

stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.     The Plaintiff's Allegations

The amended complaint names several defendants who work at Waupun: registered nurses Allison Hohenstern, Jessica Hosfelp, Megan Leberak, Whitney Pitzlin, Brian Taplin, Vick Gwendolyn and Ann York; Doctor Cheryl Jeanpierre; Health Services Unit (HSU) Manager Robert Weinman and Assistant Manager Ashley Haseleu; Maintenance Supervisor Jeremiah Dawson; Warden Randall Hepp; Deputy Warden Emily Propson; Restricted Housing Unit (RHU) Supervisor Robert Rymarkiewicz; and Security Director Yana Puish. Dkt. No. 24 at 1, 3. The plaintiff sues the defendants in their individual capacities. Id. at 1.

The plaintiff alleges that he was in the RHU at Waupun in May 2022. Id. at 4. He says that on May 4, 2022, he left Waupun for court in Brown County and returned on May 11, 2022. Id. When he returned, he experienced what he believed to be symptoms of COVID-19, including loss of smell, tightness and pain in his chest and breathing issues. Id. He wrote to the HSU asking to be seen for his symptoms, and Dr. Jeanpierre saw him on May 13, 2022. Id. Jeanpierre conducted an asthma assessment of the plaintiff and noted that he was wheezing. Id. She instructed Nurse Hohenstern to provide the plaintiff nebulizer treatment. Id. Hohenstern responded that the plaintiff would have to wait up to an hour for the treatment because she was treating another patient. Id. at 4, 6.

An hour later (during which time the plaintiff says he was in pain and having trouble breathing), Hohenstern told the plaintiff that HSU Manager Weinman had overridden Dr. Jeanpierre's recommendation that the plaintiff receive nebulizer treatment. Id. at 6. Weinman instead told Hohenstern to provide the plaintiff treatment from an aerochamber spacer, which the plaintiff says "is more effective than a nebulizer." Id. The plaintiff told Hohenstern that the spacer does not work for him and worsens his asthma, and he said he had told Jeanpierre and Weinman that previously. Id. Hohenstern contacted Weinman and told him what the plaintiff had told her. Id. The plaintiff says Hohenstern called Weinman and relayed this fact to Weinman; the plaintiff says that when she hung up the phone, Hohenstern told him "with a very nasty attitude" that Weinman had repeated his instruction to "take the spacer" and had said that "no nebulizer is giving no more in 'RHU.'" Id. The plaintiff still refused to take the spacer, saying it would worsen his asthma, and Hohenstern responded, "we[']re done here bye." Id. The plaintiff returned to his cell still struggling with pain in his chest and difficulty breathing. Id.

On May 23, 2022, the plaintiff suffered an asthma attack that he says was caused by the hot and humid conditions at Waupun and another incarcerated person being sprayed with a chemical agent. Id. He says Nurse Pitzlin did not provide him nebulizer treatment for over thirty minutes. Id. He says that she instructed the plaintiff to first use the aerochamber spacer, but the plaintiff told her he already had used it in his cell. Id. Pitzlin told the plaintiff to take it again in front of her. Id. The plaintiff says he took the

aerospace treatment in front of Pitzlin and Sgt. Dretzel (not a defendant), which he says caused him to overdose on the spacer and worsened his asthma. Id. at 6–7. Pitzlin told the plaintiff she would contact Weinman to request nebulizer treatment for the plaintiff, which she provided to the plaintiff ten to twenty minutes later. Id. at 7.

On June 12, 2022, the plaintiff had another asthma attack; he again says it was due to hot temperatures in the cell and another incarcerated person having been chemically sprayed. Id. Staff moved the plaintiff to a strip cell, where he says he had to wait a half hour before being seen by Nurse Leberak. Id. The plaintiff says that when Leberak saw him wheezing and coughing and in distress, she told the plaintiff to use the spacer, but the plaintiff told her he already had taken it and it did not work. Id. Leberak told the plaintiff that HSU staff no longer provided nebulizer treatment. Id. The plaintiff protested and insisted that he had just received nebulizer treatment on May 23, 2022, asking her to check the computer. Id. Leberak spoke with Nurse Hosfelp about it and reported back that Hosfelp had said that "they dont do nebulizer treatment in 'RHU' no more," and for him to take the aerochamber treatment. Id. The plaintiff again used the spacer, which he says did not work and which again caused him to overdose and caused his asthma to worsen. Id. Leberak then said she would call Weinman to ask if she could give the plaintiff the nebulizer. Id. The plaintiff says Leberak provided him nebulizer treatment about twenty minutes later; he complains that the "whole process" took over an hour. Id.

On June 14, 2022, the plaintiff told Nurse Taplin he was concerned that the hot and humid conditions would cause him to have another asthma attack. Id. He asked Taplin to "pull [him] out" to assess his asthma, and Taplin agreed to do so. Id. at 7–8. The plaintiff says a nearby officer's body-worn camera recorded this interaction. Id. at 8. But Taplin never took the plaintiff from his cell or assessed his asthma. Id. Later that day, the plaintiff suffered an asthma attack (again, he says, due to the heat and another incarcerated person being chemically sprayed). Id. Nurse Hosfelp saw the plaintiff over an hour later, during which time he says there was a point where he passed out in the strip cell. Id. Hosfelp said she was too busy to provide the plaintiff nebulizer treatment and instructed him to use his aerochamber spacer. Id. The plaintiff—in distress and wheezing—protested that the spacer did not work, but Hosfelp told him "you look fine to me" and refused to assess his asthma "due to [the plaintiff] writing complaints against her" to Weinman. Id. She walked off. Id. The plaintiff says a sergeant told him that it was at 7:45 p.m. on June 14, 2022 when Hosfelp failed to take his vitals, blood pressure and breath flow and failed to assess his air waves and his lungs. Id.

On July 4, 2022, the plaintiff suffered yet another asthma attack from the hot and humid conditions and "due to an inmate being chemically paint balled." Id. Staff did not remove the plaintiff from his cell or assess his asthma, even though the plaintiff says he told staff he needed a nurse. Id. While Hosfelp was passing out medication that day, the plaintiff tried to stop her and ask her to pull him out of his cell because he was in distress; he says that she kept

walking, even though he'd used the spacer and it hadn't worked. Id. at 8–9. The plaintiff says nearby officers' body-worn cameras recorded the incident. Id.

The plaintiff alleges that Nurses York and Gwendolyn responded to various requests for HSU treatment and complaints about his three-man restriction and the heat and dust in his cell. Id. Those nurses told him his issue was "already addressed" or responded that the "on going issue is not medical." Id. He says those nurses "did nothing" to treat his asthma. Id.

The plaintiff alleges that Jeanpierre did not provide adequate treatment for his wheezing despite knowing about his difficulties breathing. Id. He references the May 13, 2022 incident discussed above and complains that Jeanpierre "allowed 'RN-Weinman to over rode [*sic*] her decision in not giving [him] a nebulizer." Id. He says he was scheduled to see Jeanpierre on multiple occasions; he finally saw Jeanpierre again on June 21, 2022, during which appointment she discontinued his Dulera inhaler. Id. The plaintiff asserts that he asked Jeanpierre to give him a new inhaler, but that Jeanpierre told him, "I don[']t know what to do with you you've been on on [*sic*] 3 inhalers since your incarceration and a respiratory pill." Id. at 9–10. The plaintiff says Jeanpierre "did nothing despite [him] telling her [his] albuteral [*sic*] inhaler and spacer not working, despite her knowing of [his] asthmatic attack's [*sic*]." Id. at 10.

The plaintiff alleges that Weinman also "did nothing" despite the plaintiff writing him letters complaining about a host of issues, including him being delayed or denied medical help, his ongoing symptoms, Jeanpierre delaying his appointments, staff shortages, the hot and humid conditions in the prison,

other incarcerated persons being chemically sprayed and paint-balled and nurses allegedly lying in his records about the spacer treatment working. Id. He says Weinman responded to his HSU request slips and stated only that the plaintiff refused a COVID-19 test. Id. The plaintiff alleges that Haseleu also knew about his complaints but "did nothing and even lyed [*sic*] about [him] wanting to see 'hsu' concerning tightness and pain in [his] chest." Id. He says Haseleu's only response to his complaints was that he refused a COVID-19 test. Id.

The plaintiff alleges that he wrote to Dawson about the hot and humid conditions in the prison and asked him to fix the ventilation at Waupun. Id. at 10–11. Dawson responded that the RHU does not have air conditioning and has only "air flow." Id. at 11. The plaintiff contests this response and says he has felt "cold air coming from the ventilation" during wintertime. Id. He again says that Dawson did not do anything. Id.

The plaintiff says he wrote to Warden Hepp, Deputy Warden Propson, RHU Supervisor Rymarkiewicz and Security Director Pusich about his delayed treatment, prolonged symptoms, denial of medical care and the effect of his three-man restriction on receiving appropriate care. Id. He received a response (he does not say who wrote it) that his three-man restriction was permanent while he was at Waupun, even though he says Waupun is short-staffed and he has not been properly seen, assessed or provided medical care. Id.

The plaintiff attached to his amended complaint an institutional complaint examiner's report from an institutional complaint he filed on June 6,

2022 about not receiving nebulizer treatment. Dkt. No. 24-1 at 1. A complaint examiner reviewed the plaintiff's complaint and contacted Weinman. Id. at 2. Weinman reported that a nurse determined the plaintiff did not need nebulizer treatment after speaking with him at his cell. Id. Weinman reported that the nurse's "[c]oncerns for safety prevented further assessment from occurring." Id. Weinman noted the plaintiff had an inhaler in his cell, which "is proven to be more effective th[a]n a nebulizer treatment." Id. He noted that the plaintiff was once allowed a nebulizer, but it was removed when the plaintiff "misused the machine." Id. Weinman wrote that nurses "may give a nebulizer based on presentation and their nursing judgment. Nurse did not feel patient rose to level of needing treatment." Id. The complaint examiner accepted Weinman's report and recommended dismissing the plaintiff's complaint. Id.

The reviewing authority reviewed the complaint examiner's recommendation but explained that the plaintiff being in RHU did not mean medical staff could "deny the use of medically ordered treatments without consultation with a provider" or an assessment of his condition. Id. at 4. The reviewing authority noted that further treatment should have been provided and explained that "[s]ecurity is there to provide safety for that to occur." Id. The reviewing authority agreed that the inhaler "is as good as a nebulizer, according to providers." Id. The reviewing authority rejected the complaint examiner's recommendation and affirmed the plaintiff's complaint. Id.

The plaintiff appealed the decision on his complaint, and a corrections complaint examiner affirmed the appeal. Id. at 6. The corrections complaint

examiner approved the proper procedure to be followed as the reviewing authority had described it and copied "[a]ppropriate staff" and the warden for follow up and "corrective actions." Id. The Office of the Secretary accepted the corrections complaint examiner's recommendation and affirmed the plaintiff's appeal. Id. at 7.

The plaintiff seeks compensatory damages for each day he was denied or delayed medical treatment and punitive damages for his pain and suffering. Dkt. No. 24 at 12. He says his daily activities have been affected, including reading, working out, going to the recreation area, using the law library, sleeping, eating and so on. Id. He also asks that the court order Hosfelp, Jeanpierre and Weinman to resign and to demote Rymarkiewicz. Id. at 12.

The plaintiff also seeks multiple forms of injunctive relief. Id. at 19–20. He seeks an order requiring Waupun to provide him nebulizer treatment in his cell. Id. at 19. He seeks court orders requiring medical staff in all Wisconsin prisons to wear body cameras while in the RHU; to remove asthmatic incarcerated persons before using chemical agents on other incarcerated persons or provide them "a decontamination shower" if they are not removed; to undergo "extra training on people with asthma and [be] asked 70 questions on a questionair [sic], and if they failed 3 times have to wait 1 year to reapply and have to score 90 or better;" and to take random drug tests for "any illegal drugs two times a year," and if the test is inconclusive or positive, that employee must be fired or prohibited from working in any Wisconsin prison after three failed tests. Id. at 19–20. He also seeks an injunction prohibiting

medical staff from working in Wisconsin prisons if they are transferred to a different institution at least three times because of their conduct. Id. at 19. Finally, he seeks an injunction requiring installation of adequate ventilation in the RHU at Waupun and air conditioning for the summer months. Id. at 20.

C.    Analysis

The court reviews the plaintiff's allegations regarding the denial of proper medical care for his asthma under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." Gabb v. Wexford Health Sources, Inc., 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim, the plaintiff must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)); see Estelle, 429 U.S. at 103. To satisfy the objective component, the plaintiff must show that he had a medical condition "that is so obvious that even a lay person would perceive the need for a doctor's attention." Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. A prison official shows deliberate

13

indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez, 792 F.3d at 776 (citing Farmer, 511 U.S. at 837).

The plaintiff alleges that he suffers from asthma and repeatedly experienced chest tightness, difficulty breathing, nose bleeds and asthma attacks. The Seventh Circuit has held "that asthma can be, and frequently is, a serious medical condition, depending on the severity of the attacks." See Board v. Farnham, 394 F.3d 469, 484 (7th Cir. 2005) (citing Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001)). The court finds that, for the purposes of this order, the plaintiff's allegations satisfy the objective component of an Eighth Amendment claim.

Whether the allegations satisfy the subjective component depends on the amended complaint's allegations as to each individual defendant, because the amended complaint describes various events that occurred over several weeks. The plaintiff alleges that Weinman denied him nebulizer treatment and instead ordered treatment using an aerochamber spacer. The plaintiff says Weinman knew the spacer treatment was not effective at treating the plaintiff's asthma because the plaintiff previously told Weinman it did not help. The plaintiff says Weinman is not a doctor and did not personally treat his asthma. He alleges that Weinman failed to take any action on his HSU complaints, which alleged delay or denial of proper medical treatment, continued symptoms from the conditions in the plaintiff's cell and falsification of his medical records.

Because Weinman is not a doctor and did not personally examine or treat the plaintiff, he cannot be liable for providing inadequate treatment. But as the HSU Manager, Weinman likely could or should have taken other actions to make sure the plaintiff was receiving proper treatment from HSU staff. The complaint examiner's report attached to the amended complaint shows that Waupun staff did not believe the plaintiff was receiving proper treatment for his asthma in the RHU despite Weinman's assurance that the aerochamber spacer worked better than a nebulizer. The plaintiff says he told Weinman previously that the spacer did not work to treat his asthma and that it worsened his symptoms, but Weinman still told HSU staff to provide the plaintiff the spacer treatment instead of nebulizer treatment. These allegations are sufficient to suggest that Weinman was aware of but disregarded the plaintiff's asthma by repeatedly ordering treatment he knew to be ineffective. See Greeno, 414 F.3d at 655 (noting that prison officials may violate Eighth Amendment if they "doggedly persisted in a course of treatment known to be ineffective"). The court will allow the plaintiff to proceed on an Eighth Amendment claim against Weinman.

The plaintiff alleges that Dr. Jeanpierre and Nurses Hohenstern, Pitzlin and Leberak did not provide him timely treatment and that, when they *did* treat him, they forced him to use the aerochamber spacer before receiving nebulizer treatment. The plaintiff says Jeanpierre ordered nebulizer treatment for him on May 13, 2022, but that Hohenstern told him that Weinman had overridden that order, saying that he should instead receive the aerochamber

spacer treatment. The plaintiff faults Jeanpierre for this, but the plaintiff has not alleged that Jeanpierre had any idea her order had been overridden. Jeanpierre ordered nebulizer treatment for the plaintiff, not the aerochamber spacer treatment. It was *Weinman* who overrode Jeanpierre's order—possibly without Jeanpierre's knowledge—and the court has ruled that the plaintiff may proceed against Weinman.

The plaintiff also appears to allege that Jeanpierre became frustrated during a June 21, 2022 appointment, noting that when the plaintiff asked for a different, replacement inhaler to the Dulera inhaler, Jeanpierre responded that she did not know what to do with him because she had tried several different treatment options without success. Instead of showing that Jeanpierre was deliberately indifferent to the plaintiff's serious medical needs, the plaintiff's allegation show that Jeanpierre did not disregard the plaintiff's condition; over time she tried various options to address his asthma. When she ordered nebulizer treatment—the plaintiff's preferred treatment—Weinman overruled that order. The plaintiff's allegations suggest that Jeanpierre's efforts were reasonable and not deliberately indifferent. See Peate v. McCann, 294 F.3d 879, 882 (7th Cir. 2002) ("[P]rison officials who actually knew of a substantial risk to prisoner health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent."); Barrows v. Goldman, 858 F. App'x 199, 201 (7th Cir. 2021) (citing Farmer, 511 U.S. at 843; and Johnson v. Dominguez, 5 F.4th 818, 824–25 (7th Cir. 2021)) ("A

defendant is not liable under the Eighth Amendment if [s]he responds reasonably to a risk, even if the harm was not avoided."). The court will not allow the plaintiff to proceed against Jeanpierre and will dismiss her as a defendant.

Hohenstern is a different matter. Jeanpierre—a doctor—ordered Hohenstern to give the plaintiff a nebulizer treatment. Hohenstern responded that she could not do so right away because she was treating another patient. But some time later—the plaintiff says an hour—Hohenstern told the plaintiff that Weinman (who is not a doctor) had overridden Jeanpierre's order and ordered that the plaintiff receive the aerochamber spacer treatment. The plaintiff told Hohenstern that treatment did not work for him and exacerbated his symptoms. Hohenstern went back to Weinman, who reiterated that the plaintiff should receive the aerochamber spacer treatment, not nebulizer treatment. Hohenstern relayed that response to the plaintiff. When the plaintiff refused the aerochamber treatment because it would exacerbate his asthma, Hohenstern alleged said, "We're done here," and left the plaintiff untreated and struggling with asthma symptoms.

"[A] nurse confronted with an 'inappropriate or questionable practice' should not simply defer to that practice, but rather has a professional obligation to the patient to 'take appropriate action,' whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority." <u>Berry v. Peterman</u>, 604 F.3d 435, 443 (7th

Cir. 2010) (quoting American Nurses Ass'n, Code of Ethics for Nurses With Interpretative Statements, Provision 3-5 (2001), at http://nursingworld.org/ethics/code/protected_nwcoe813.htm). The plaintiff has alleged that Hohenstern had reason to know that the aerochamber spacer treatment not only did not work for him, but made his symptoms worse. She had a direct order from a doctor—Jeanpierre—to provide the plaintiff with nebulizer treatment, yet appears to have gone to Weinman, who was not a doctor, for direction about whether to give that treatment. And when the plaintiff explained again that the treatment Weinman had ordered did not work for him, Hohenstern allegedly left him untreated. The Seventh Circuit has held that "[a]s a matter of professional conduct, nurses may defer to instructions given by physicians unless 'it is apparent that the physician's order will likely harm the patient.'" Holloway v. Delaware Cty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) (quoting Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010)). In following a physician's orders, a nurse is deliberately indifferent to a risk of harm only if the risk to the plaintiff's health was "obvious." Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 683 (7th Cir. 2012). Hohenstern did not defer to the instructions of a physician; she deferred to the instructions of an administrator. The court will allow the plaintiff to proceed against Hohenstern.[2]

---

[2] The plaintiff's assertion that Hohenstern had "a very nasty attitude" when telling him about Weinman's direction does not state a claim; incidents of poor manners or harsh language do not violate the Eighth Amendment. See Lisle v. Welborn, 933 F.3d 705, 719 (7th Cir. 2019) (explaining that prison staff's use of "[r]epugnant words . . . will seldom rise to an Eighth Amendment violation" because "[r]elationships between prisoners and prison staff are not always marked by genteel language and good manners").

Pitzlin and Leberak, however, provided the plaintiff with the treatment that he told them worked for him, even though it took them some time to do so. The amended complaint alleges that when the spacer treatment did not work for the plaintiff, Pitzlin and Leberak advised Weinman of that fact and were able to provide the plaintiff with nebulizer treatment. These actions do not show that the nurses were deliberately indifferent to the plaintiff's condition. Although they first followed Weinman's instructions, when it was clear to them that the aerochamber spacer treatment was ineffective, they used their judgment to obtain permission to provide nebulizer treatment. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment."). The plaintiff also complains about the time he had to wait for nebulizer treatment. But "the Constitution does not mandate immediate care." Moore v. Williams, 835 F. App'x 143, 145 (7th Cir. 2021) (citing Knight v. Wiseman, 590 F.3d 458, 466 (7th Cir. 2009)). The court will dismiss defendants Pitzlin and Leberak.

The plaintiff's only allegations against Nurse Taplin are that on one occasion, he asked Taplin to remove him from his cell because it was expected to be hot and humid that day. He says that Taplin agreed but did not pull the plaintiff from his cell. The amended complaint does not allege that Taplin *intentionally* refused to pull the plaintiff from his cell. It is possible that Taplin forgot about the plaintiff's request while he was performing his other daily

responsibilities in the prison, or was prevented from returning due to other obligations. Without some allegation that Taplin intentionally refused to pull the plaintiff from his cell, the court cannot conclude that the plaintiff has alleged that Taplin was *deliberately* indifferent and not merely negligent, and negligence does not violate the Eighth Amendment. See Farmer, 511 U.S. at 835–36; Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation."). The court will dismiss defendant Taplin.

The plaintiff alleges that Nurse Hosfelp refused to provide him treatment on two occasions. During the first, he says she refused to treat him because of previous complaints he had written against her and sent to Weinman. Those allegations suggest a claim of retaliation, which the court will address below. The second incident occurred on July 4, 2022, when Hosfelp allegedly ignored the plaintiff's request for nebulizer treatment made to her while she was passing out medication. The court must accept as true the amended complaint's allegation that Hosfelp ignored the plaintiff's medical need and request for treatment on July 4, 2022. Ignoring a prisoner's request for necessary medical treatment would constitute deliberate indifference to that medical need. Although the details of this claim are sparse, the court will allow the plaintiff to proceed on this claim against Hosfelp.

Defendants York and Gwendolyn did not see, speak with or examine the plaintiff; they responded to his requests for treatment in the HSU and,

according to the plaintiff, took no further action. He says they told him his medical issue was "already addressed," or that the ongoing issue was not medical in nature. The "already addressed" response implies that other medical staff (like Weinman and Jeanpierre) already had addressed the plaintiff's concerns about his asthma. For the same reasons explained above, York and Gwendolyn cannot be held liable for deferring to the treatment decisions of superior medical officials. That is especially so because these nurses never examined the plaintiff or provided treatment. The plaintiff may have been dissatisfied with his course of treatment, but his dissatisfaction with the treatment—especially treatment these nurses did not provide—does not constitute deliberate indifference. See Johnson, 5 F.4th at 826 (citing Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006)) (noting that "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to state an Eighth Amendment claim).

The plaintiff also alleges that York and Gwendolyn refused or failed to take any action in response to his complaints about his three-man restriction. They told him that issue was "on going" and "not medical." The court is aware from the plaintiff's many previous cases that his three-man restriction means that he cannot be removed from his cell without a security escort unless there is an emergency. See, e.g., Case No. 22-cv-585-WED, Dkt. No. 14 at 8. As nurses, York and Gwendolyn would have had no authority to override the plaintiff's three-man restriction, which was a security restriction put in place by non-medical prison authorities. The plaintiff cannot sue medical staff for the

decisions of authorities from a different division of the prison. See Burks v. Raemisch, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). The amended complaint does not state a claim against York or Gwendolyn.

The plaintiff similarly sues Warden Hepp, Deputy Warden Propson, RHU Supervisor Rymarkiewicz and Security Director Pusich for their responses to his complaints about his delayed treatment, prolonged symptoms, denial of medical care and the effect of his three-man restriction on receiving appropriate care. One or more of those authorities responded that the plaintiff's three-man restriction was permanent while he was at Waupun. "[P]rison officials have broad administrative and discretionary authority over the institutions they manage," which includes prisoner security matters. Westefer v. Neal, 682 F.3d 679, 683 (7th Cir. 2012) (quotation omitted). The court will not interfere with these prison officials' determination that a permanent three-man restriction is necessary for the plaintiff because doing so would be "highly intrusive to the inner workings of the prison system and would tread upon the DOC's authority over running their institution." Capoeira v. Pollard, No. 16-CV-224-LA, 2016 WL 1452398, at *4 (E.D. Wis. Apr. 13, 2016).

The plaintiff also complains that these officials did not respond to his complaints about medical staff. But high-level chief administrators—like the warden, deputy warden, supervisors and directors—"are ordinarily not personally liable for decisions made by subordinates, even if they receive a letter complaining about those decisions and do not intervene." Courtney v.

Devore, 595 F. App'x 618, 620 (7th Cir. 2014) (citing Burks, 555 F.3d at 595–96). The fact that these officials received letters from the plaintiff about his inadequate treatment is not enough for the court to find that he has stated a claim that they were deliberately indifferent to his medical needs. The court will not allow the plaintiff to proceed in this action against Hepp, Propson, Rymarkiewicz or Puish.

The plaintiff alleges that Haseleu did nothing in response to his complaints and lied about him wanting to see the HSU for his symptoms. Like York and Gwendolyn, Haseleu did not see or examine the plaintiff or treat his conditions. She merely responded to his HSU requests. She cannot be held liable for those responses. But if the plaintiff requested treatment, and Haseleu falsely reported that he was *not* requesting treatment or falsely reported that the aerochamber spacer was alleviating his symptoms, that could be a sign of deliberate indifference on her part. In an abundance of caution, the court will allow the plaintiff to proceed against Haseleu on this claim.

The plaintiff also seeks to proceed against Dawson, the maintenance supervisor at the prison, for not properly responding to his complaints about the hot and humid conditions at the prison. He says Dawson told him the prison has only "air flow," and not air conditioning, which the plaintiff believes is untrue. If the plaintiff intended to allege a deliberate-indifference-to-serious-medical-need claim against Dawson, he cannot proceed on such a claim. Dawson is not a medical professional and was not responsible for the plaintiff's medical care or medical staff's responses to his complaints about the

conditions in the prison. See Burks, 555 F.3d at 595. If the plaintiff intended to allege a deliberate-indifference-to-conditions-of-confinement claim against Dawson, he has not stated facts sufficient to support such a claim. The plaintiff has not alleged that the conditions in his cell amount to cruel and unusual punishment. See Giles v. Godinez, 914 F.3d 1040, 1051 (7th Cir. 2019). He has alleged only that there were some days when the cell was warm, muggy and dusty; this is not a claim that Dawson denied him "the minimal civilized measure of life's necessities," or that Dawson created an excessive risk to the plaintiff's life and safety. Id. (quoting Isby v. Brown, 856 F.3d 508, 521 (7th Cir. 2017)). The court will dismiss Dawson.

The plaintiff also asserts that on June 14, 2022, Nurse Hosfelp refused to provide him treatment for his asthma because of past complaints that he filed against her. The court analyzes these allegations under the First Amendment. See Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). To state a claim of retaliation, the plaintiff must allege that "he engaged in a protected activity," "he suffered a deprivation likely to prevent future protected activity" and "his protected activity was a motivating factor in the defendants' decision to retaliate." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018) (citing Perez, 792 F.3d at 783). The plaintiff's allegations satisfy the first of these elements because the filing of previous complaints generally constitutes protected activity. See Holleman v. Zatecky, 951 F.3d 873, 878 (7th Cir. 2020); Harris v. Walls, 604 F. App'x 518, 521 (7th Cir. 2015).

The court applies an objective test to determine whether the plaintiff's allegations satisfy the second element: "'whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.'" Douglas v. Reeves, 964 F.3d 643, 646 (7th Cir. 2020) (quoting Surita v. Hyde, 665 F.3d 860, 878 (7th Cir. 2011)). Because this standard is objective, "a specific plaintiff's persistence does not undermine his claim." Id. (citing Holleman, 951 F.3d at 880). The court finds that denying an incarcerated person medical treatment because he has filed past complaints likely would deter him from continuing to engage in those protected activities. It is not relevant that this plaintiff has continued to file complaints. The amended complaint satisfies this second element.

To prove the third element, the plaintiff must show more than that the defendant's action occurred after his protected activity. He must show that the defendant knew about his protected conduct and acted because of it. See Healy v. City of Chi., 450 F.3d 732, 740–41 (7th Cir. 2006). In other words, the plaintiff must show that the protected activity was "a 'but-for' cause" of the adverse action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." Nieves v. Bartlett, ___ U.S. ___, 139 S. Ct. 1715, 1722 (2019); see Winston v. Fuchs, 837 F. App'x 402, 404 (7th Cir. 2020). The plaintiff says that Hosfelp specifically mentioned the plaintiff's past complaints against her as her reason for refusing to treat his asthma. The court finds that these allegations are sufficient to show Hosfelp knew about the plaintiff's past protected activity and refused him medical

treatment because of that protected activity. The court will allow the plaintiff to proceed on a First Amendment claim of retaliation against Hosfelp.

In summary, the claims on which the court will allow the plaintiff to proceed are as follows: 1) an Eighth Amendment claim that Weinman knew about the plaintiff's need for nebulizer treatment but overrode that request and allowed only aerochamber spacer treatment despite knowing that treatment was not effective for the plaintiff's asthma; 2) an Eighth Amendment claim against Nurse Hohenstern for ignoring the plaintiff's assertions that the aerochamber spacer did not work for him and refusing to treat him when he would not use the spacer; 3) an Eighth Amendment claim that Nurse Hosfelp ignored the plaintiff's need for treatment for his asthma on July 4, 2022; 4) an Eighth Amendment claim that Haseleu intentionally misreported that the plaintiff was not requesting HSU treatment for his asthma symptoms; and 5) a First Amendment claim of retaliation against Hosfelp for refusing him treatment on June 14, 2022, because of past complaints he filed against her.

The plaintiff seeks both damages and various forms of injunctive relief. He wants all medical staff in Wisconsin prisons to comply with numerous new requirements, including wearing body cameras, removing asthmatic incarcerated persons from their cells before using chemical agents, undergoing extra training for dealing with asthmatic incarcerated persons and being subjected to random drug tests. He also seeks implementation of new rules for transfers of medical staff and installation of new ventilation at Waupun. As discussed above, prison officials have broad discretion over their institutions.

See Westefer, 682 F.3d at 683. The court does not have the authority to order Wisconsin prisons to create and enforce new procedures, rules or facility changes. That sweeping, broad enforcement is far beyond the narrow injunctive relief necessary or available to a single plaintiff in a lawsuit governed by the PLRA. See 18 U.S.C. §3626(a)(2).

The plaintiff also wants the court to order Hosfelp, Jeanpierre and Weinman to resign and to demote Rymarkiewicz. The court previously has explained to the plaintiff that it has no authority over hiring or firing decisions at state prisons. See Case No. 21-cv-281-pp, Dkt. No. 8 at 5 ("The court does not have the authority to direct the DOC to fire its employees or to force the employees to resign."). This case will proceed only on the plaintiff's request for damages and his more-limited request for injunctive relief that he be provided nebulizer treatment at Waupun.

## III.  Motion for a Preliminary Injunction (Dkt. No. 5)

As an initial matter, the court notes that on November 1, 2022, the court received the following documents from the plaintiff:

* The original complaint (Dkt. No. 1);
* The original (and almost illegible) motion to proceed without prepaying the filing fee (Dkt. No. 2);
* A partial trust fund statement for the plaintiff's account (Dkt. No. 3);
* "Plaintiff Motion for an Preliminary Injunction for him to have nebulizer machine or battery op in cell" (Dkt. No. 5);
* "Plaintiff Brief in Support of his motion for preliminary injunction" (Dkt. No. 6);
* "Plaintiff declaration in support of his motion for a preliminary injunction" (Dkt. No. 7);
* "Order to show cause on this preliminary injunction" (Dkt. No. 4);

* Six declarations from other incarcerated persons (Dkt. Nos. 10-12, 14-16);
* "Plaintiff Motion for appointment of counsel" (Dkt. No. 8);
* "Plaintiff brief in support of his motion for appointment of counsel" (Dkt. No. 9);
* "Plaintiff Declaration in support of his motion for appointment of counsel" (Dkt. No. 13); and
* A packet of seventy-two (72) pages that included a letter from the ACLU, interview requests, grievances, grievance responses (including the ones he attached to his amended complaint) and health services requests (Dkt. No. 13-1).

Some of these documents make clear in their titles or captions whether they relate to the motion for a preliminary injunction, the motion to appoint counsel or the initial complaint. But the seventy-two-page packet contains an assortment of documents, some of which appear to relate to the motion to appoint counsel (a letter from the ACLU to the plaintiff) and others of which could be in support of the original complaint, the motion for preliminary injunctive relief or both. On some of the seventy-two pages, the plaintiff has written exhibit numbers (and some of those numbers are hard to read). Others contain no exhibit numbers. The plaintiff's brief in support of the motion for a preliminary injunction references exhibit numbers but does not explain what those exhibits are or how they support the argument he is making.

When the plaintiff sends multiple motions and documents to the court, the clerk's office does its best to sort out those documents. But if the plaintiff does not clearly indicate which exhibits relate to which pleadings, the clerk's office can't always figure out which exhibits relate to which motions. And there is no requirement that the court or court staff spend hours trying to match up the documents or trying to figure out which documents the plaintiff believes

28

support which pleading. It would be much easier for the court to understand what the plaintiff is trying to do if he filed only one pleading—and the supporting documents for that pleading—at a time and made clear in briefs and other pleadings which supporting documents support what arguments ("See Exhibit B-1, January 5, 2022 letter from Warden," for example).

The plaintiff's motion for a preliminary injunction asks the court to order the prison to provide him "nebulizer machine or battery op in cell." Dkt. No. 5. Accompanying that motion are a brief and a declaration in support of the motion, which contain the same general information. Dkt. Nos. 6, 7. The plaintiff recounts his history of asthma and asthma attacks at Waupun, his allegedly delayed treatment for his symptoms and the hot and humid conditions worsening his asthma. Dkt. No. 6 at 1–2. He also recounts HSU staff telling him to use the aerochamber spacer, despite him telling them repeatedly that it does not relieve his symptoms. Id. at 2. He cites numerous exhibits, but as the court noted above, it cannot always determine which exhibits support which arguments, or even which exhibits relate to the motion for preliminary injunction. Id. at 2–3. The plaintiff asserts that he will suffer irreparable injury without the injunction, that the balance of hardships tips in his favor and that the relief he seeks will serve the public interest. Id. at 4–9.

To obtain preliminary injunctive relief, the plaintiff must show that (1) his underlying case has some likelihood of success on the merits, (2) no adequate remedy at law exists and (3) he will suffer irreparable harm without the injunction. Wood v. Buss, 496 F.3d 620, 622 (7th Cir. 2007). The plaintiff

must show more than "a mere possibility of success" to demonstrate his entitlement to a preliminary injunction. Ill. Republican Party v. Pritzker, 973 F.3d 760, 762 (7th Cir. 2020), cert. denied, 141 S. Ct. 1754 (2021). To obtain a preliminary injunction, he must make a "'strong' showing" that he is likely to succeed, which "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." Id. at 763 (7th Cir. 2020). If the plaintiff can establish those three threshold factors, then the court must balance the harm to each party and to the public interest from granting or denying the injunction. See Wood, 496 F.3d at 622; Korte v. Sebelius, 735 F.3d 654, 665 (7th Cir. 2013); Cooper v. Salazar, 196 F.3d 809, 813 (7th Cir. 1999). The balancing analysis "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." Mays v. Dart, 974 F.3d 810, 818 (7th Cir. 2020) (citing Ty, Inc. v. Jones Grp., Inc., 237 F.3d 891, 895 (7th Cir. 2001)). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

In the context of litigation by incarcerated persons, the scope of the court's authority to issue an injunction is circumscribed by the PLRA. See Westefer, 682 F.3d at 683. Under the PLRA, preliminary injunctive relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. §3626(a)(2); see also

Westefer, 682 F.3d at 683 (noting the PLRA "enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: [P]rison officials have broad administrative and discretionary authority over the institutions they manage" (internal quotation marks and citation omitted)).

The court will deny the plaintiff's request for a preliminary injunction. First, the plaintiff has not satisfied his burden on the threshold factor of showing that he is likely to succeed on the merits of his case. This is the seventh lawsuit the plaintiff has filed in this court alleging that HSU officials at Waupun (some of whom are named in this lawsuit) failed to provide him adequate nebulizer treatment for his asthma. See Case Nos. 20-cv-1889-pp, 20-cv-1890-pp, 21-cv-153-pp, 21-cv-154-pp, 21-cv-822-pp, 21-cv-883-pp. The court dismissed the first two cases at summary judgment because the plaintiff failed to provide evidence showing that HSU staff were deliberately indifferent to his medical need to keep a nebulizer in his cell for his asthma. Case Nos. 20-cv-1889-pp, Dkt. No. 50; 20-cv-1890-pp, Dkt. No. 103. The court dismissed Case No. 21-cv-153-pp at screening because the plaintiff failed to state a claim showing that HSU staff intentionally did not provide him nebulizer treatment. Case No. 21-cv-153-pp, Dkt. No. 15. The other cases remain pending. The court knows from those cases that the plaintiff has restricted access to a nebulizer because he

> had assaulted staff and refused to return a nebulizer after treatment, so RHU staff had to be very cautious in providing him nebulizer treatments; when needed, staff brought the nebulizer machine and an extension cord to the cell door, put a "trap box" on the cell door and fed the mouthpiece of the nebulizer through the door for the plaintiff to use.

Case No. 20-cv-1890-pp, Dkt. No. 103 at 10.

The plaintiff may or may not have a stronger case of deliberate indifference in this case than in his past cases. It is too early to tell at this stage of the proceedings, where the court must accept the allegations in the amended complaint as true and where the defendants have not yet had a chance to respond and refute those allegations. The plaintiff's motion for a preliminary injunction and materials in support of his motion provide no additional information suggesting that the plaintiff is likely to succeed in this lawsuit or explaining how he intends to prove the key elements of his case. The brief in support of the motion recounts the allegations in the amended complaint and cites exhibits that the court cannot always identify. The vague possibility that the plaintiff may be successful in this lawsuit is insufficient to grant him the extraordinary remedy of a preliminary injunction.

Nor has the plaintiff demonstrated irreparable harm. The facts alleged in the amended complaint demonstrate that the plaintiff is receiving medical treatment. He does not agree with that treatment, but disagreement with a particular course of treatment does not demonstrate deliberate indifference, much less irreparable harm. The medical staff at the prison are treating the plaintiff for his asthma. They are trying different kinds of treatments. The plaintiff has not demonstrated that if the court does not order the prison to give him nebulizer treatments when he demands them, he will suffer *irreparable* harm. He has alleged that he has suffered discomfort. That is not irreparable harm.

The court will deny the plaintiff's motion for a preliminary injunction requiring the prison to provide him nebulizer treatment.

## IV. Motion to Appoint Counsel (Dkt. No. 8)

The plaintiff also asks the court to appoint an attorney to represent him. Dkt. No. 8. The plaintiff says he cannot afford counsel on his own, his imprisonment "will greatly limit his ability to litigate," his case involves complex issues and counsel is better equipped to handle a trial than he is. Id. He also says he "has made repeated efforts to obtain a lawyer" without success. Id.

The plaintiff filed a brief in support of his motion. Dkt. No. 9. The brief recounts the facts of his case and his claims for relief. Id. at 1–2. The plaintiff reiterates that the facts of his case are complex, pointing to the "sheer number of claims and defendants." Id. at 3. He says that he is in the RHU on administrative confinement, so "he is unable to identify, locate and interview the inmates who was housed in, nearby cells, [*sic*] and who saw or heard of [his] distress for help." Id. at 4. The plaintiff says the medical staff he expects to speak with about his claims likely will provide conflicting testimony, which will create "a credibility contest between the Defendants and the Plaintiff (and such inmates witnesses as can be located[)]." Id. at 5. The plaintiff asserts that his allegations, "if proved, clearly would establish a constitutional violation." Id. at 6. Finally, he says he has contacted attorneys from the ACLU, private firms in the area and the Southern Poverty Law Center in Montgomery, Alabama. Id. at 7–8. He says he received a reply from the ACLU, which advised him that they "do not have enough staff and training volunteers." Id. at 8.

The plaintiff also filed his own declaration, which reiterates the same information in his brief in support of his motion to appoint counsel. Dkt. No. 13. He attached to the declaration the responses he received on August 9, 2022, from the ACLU and on September 22, 2022, from the Southern Poverty Law Center, which noted its inability "to respond in detail to mail." Dkt. No. 13-1 at 1–2. That letter also provides several online resources for legal assistance. Id. at 2.

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866–67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Eagan v. Dempsey, 987 F.3d 667, 682 (7th Cir. 2021) (quoting Pruitt v. Mote, 503 F.3d 647, 654–55 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Auth., 930 F.3d 869, 871 (7th Cir. 2019). "This is a mandatory, threshold inquiry that

must be determined before moving to the second inquiry." Eagan, 987 F.3d at 682. To do so, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

In particular, the lawyers' responses may have bearing on the court's decision to exercise its discretion because they may shed light on whether the plaintiff's attempts to hire counsel were reasonable. Pickett, 930 F.3d at 871. In deciding whether to recruit counsel, the court should consider the reasons the lawyer declined representation, including whether the plaintiff was unwilling (as opposed to unable) to pay a retainer; whether the lawyer lacked time or capacity to take on new clients; or whether the subject matter of the case requires a lawyer who specializes in a specific area of law. Id. The court should also consider how well the plaintiff articulated his case to the prospective lawyer. Id. Where a plaintiff "conveyed his situation well and counsel deemed the claim feeble, then it would be inappropriate for a court to intervene" and recruit counsel. Id. But, where a plaintiff is inarticulate, then a court "may have a useful role to play in recruiting counsel." Id.

"The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims." Eagan, 987 F.3d at 682. When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel."

<u>Pennewell v. Parish</u>, 923 F.3d 486, 490 (7th Cir. 2019). The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." <u>Id.</u> This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." <u>Id.</u> at 490–91. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." <u>Id.</u> at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." <u>Pickett</u>, 930 F.3d at 871.

The plaintiff says he contacted several attorneys or firms asking them to represent him, and he received at least two responses. The responses from the ACLU and the Southern Law Poverty Center say nothing about the merits of the plaintiff's case; they cite only the limited resources of those organizations as the reason why they cannot represent him. Dkt. No. 13-1 at 1–2. The court nonetheless finds that the plaintiff's motion and supporting documents show he has made a sufficient attempt to obtain counsel on his own.

But the plaintiff has not satisfied the second <u>Pruitt</u> inquiry. The plaintiff asserts that he needs assistance litigating this case because of his limited resources and education, the complex issues in his case and his inability to effectively litigate this case compared with that of a recruited attorney. This is

the thirteenth civil §1983 lawsuit the plaintiff has filed since December 2020. Nearly all those cases have proceeded past screening, and several have reached the summary judgment stage. With each case he files, the plaintiff's pleadings have become longer and more detailed, he has filed more motions requesting more forms of relief and he has cited more authority in support of his motions and pleadings. The plaintiff's lawsuits show an increase in sophistication and his understanding of the civil litigation process. He has proven that he is able to effectively litigate his cases on his own and without counsel's assistance.

The court disagrees with the plaintiff's stated reasons why he believes that an attorney must litigate this case. The plaintiff notes that his case has several claims and defendants, arguing that this shows that his case is complex. But the court is dismissing several of the defendants and limiting the plaintiff to four similar Eighth Amendment claims and one First Amendment claim. The facts of the case are not as complex as the plaintiff makes them out to be. He says he required nebulizer treatment for his asthma and communicated that to the defendants. He says the defendants failed to provide him nebulizer treatment or ignored his requests. He also says that on one occasion, one defendant cited his past complaints about her as reason not to provide him medical treatment. The plaintiff's amended complaint shows he had a strong grasp of the relevant facts related to each of these claims.

The plaintiff says he is unable to investigate the facts of his case or speak with nearby incarcerated persons who may have information because of his administrative confinement. But he has filed numerous declarations from other

incarcerated persons in support of his claims. It does not appear that he had trouble gathering the information needed to present his claims, and the declarations he provided cut against his assertion that he will have difficulty collecting more information in the future. The plaintiff's concern about a "credibility contest" between his witnesses and the defendants also is unsupported. The court is required to accept sworn declarations from other incarcerated persons as true and cannot weigh their credibility against statements from prison staff. That credibility determination is for a jury. Even then, there is no guarantee this case will reach a jury trial. This case is in its infancy. The defendants have not yet been served with the amended complaint, responded to it or begun collecting information to refute the plaintiff's allegations. It is far to soon for the court to determine whether the defendant would need the assistance of a lawyer at trial; the case has not even passed the screening stage.

As the case progresses, the legal and factual issues may become too complex for the plaintiff, his circumstances may change or he may find himself unable to obtain the information he believes he needs to prove his claims. If that happens, or if this case does proceed to a trial, the court may revisit this decision and decide to recruit counsel for the plaintiff. But at this early stage of the litigation, the plaintiff has not shown he is one of those indigent litigants most in need of an attorney to present his claims adequately. The court will deny his request for recruitment of counsel without prejudice. That means the plaintiff may again request counsel later if circumstances change.

## V. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES** the plaintiff's motion for a preliminary injunction. Dkt. No. 5.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion to appoint counsel. Dkt. No. 8.

The court **DENIES AS MOOT** the plaintiff's second motion for leave to proceed without prepaying the filing fee. Dkt. No. 17.

The court **DENIES AS MOOT** the plaintiff's motion to waive payment of the initial partial filing fee. Dkt. No. 23.

The court **DISMISSES** defendants Megan Leberak, Whitney Pitzlin, Brian Taplin, Vick Gwendolyn, Ann York, Cheryl Jeanpierre, Jeremiah Dawson, Randall Hepp, Emily Propson, Robert Rymarkiewicz and Yana Puish.

Under an informal service agreement between the Wisconsin Department of Justice and the court, the court will electronically transmit a copy of the amended complaint and this order to the Wisconsin Department of Justice for service on defendants Robert Weinman, Allison Hohenstern, Jessica Hosfelp and Ashley Haseleu. Under the informal service agreement, the court **ORDERS** those defendants to respond to the amended complaint within 60 days.

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$347.55** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an

amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Waupun Correctional Institution.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and completing dispositive motions.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[3] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

---

[3] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

Case 2:22-cv-01293-PP   Filed 02/23/23   Page 40 of 41   Document 26

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the Clerk of Court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing this case without further notice.

Dated in Milwaukee, Wisconsin this 23rd day of February, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**